UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------x
FURNACE BROOK LLC,

                              Plaintiff,

                                                          05 Civ. 7329 (CLB)

            - against -
                                                          ***Memorandum and Order***
OVERSTOCK.COM, INC.                                       ***Markman Hearing***

                              Defendant.
---------------------------------------------------------x
Brieant, J.

        On March 7, 2006, the Court held a claim construction hearing in accordance with

*Markman v. Westview Instruments, Inc.,* 52 F.3d 967 (Fed. Cir. 1995) (en banc), *aff'd* 516 U.S.

370 (1996), on U.S. Patent No. 5,721,832, entitled *Method and Apparatus for an Interactive*

*Catalog System*.  On May 26, 2006, the parties appeared before the Court for a hearing on

separate motions filed in this case.  On that date, the parties informed the Court that their

mediation efforts following the *Markman* hearing in March were unsuccessful, and accordingly

that construction of the disputed claims by the Court was indeed necessary.


        Plaintiff, Furnace Brook is a New York corporation with its principal place of business in

New York.  Edward R. Gomez is the President and sole owner of Furnace Brook, LLC.

Overstock is a Delaware corporation with a principal place of business in Utah.  Overstock

operates a website "overstock.com," through which people make online purchases of discount,

name-brand merchandise for sale primarily over the internet.  Furnace Brook is the owner by

assignment of U.S. Patent No. 5,721,832, entitled *Method and Apparatus for an Interactive*

*Computerized Catalog System* ("the '832 patent"), which issued in 1998.  Familiarity of the

reader with all prior proceedings and decisions by this Court in this litigation is presumed.  The

Court will address the six disputed claims for which construction was argued before the Court at the *Markman* hearing.  *See March 6, 2006, Transcript at 2, 22.*

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'"  *Phillips v. AWH Corp*., 415 F.3d 1303, 1312 (Fed. Cir. 2005).  The purpose of a *Markman* hearing is to allow a court to examine and resolve disputes over the scope and meaning of the claim language in the patent. "[T]he interpretation and construction of patent claims, which define the scope of the patentee's rights under the patent, is a matter of law exclusively for the court."  *Markman*, 52 F.3d at 970-71. When construing claim language, a court should look first at the claims themselves, then the specifications, and finally the prosecution history of the patent if in evidence.  *Id*. at 980.  These three sources, referred to as "intrinsic evidence" are the "most significant source[s] of the legally operative meaning of the disputed claim language."  *Vitronics Corp. v. Conceptronic, Inc*., 90 F.3d 1576, 1582 (Fed. Cir. 1996).  If the meaning of the language within the claim is still unclear, extrinsic evidence, such as expert and inventor testimony, dictionaries, and learned treatises, can be used "to aid the court in coming to a correct conclusion" as to the "true meaning of the language employed in the patent."  *Markman*, 52 F.3d at 980.  However, extrinsic evidence should only be "used for the court's understanding of the patent, not for the purpose of varying or contradicting the terms of the claims."  *Id*. at 981.

There is a "heavy presumption" that the claim terms carry their ordinary meaning as viewed by one having ordinary skill in the art.  *Rexnord Corp. v. Laitram Corp.,* 274 F.3d 1336,

2

1341 (Fed. Cir. 2001).  This presumption can be rebutted where (1) the patentee clearly

established a definition of the term differently from its customary meaning, *Vitronics Corp. v.*

*Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996); (2) where a claim term deprives the

claim of clarity such that there is no means by which the scope of the claim may be ascertained

from the language used, *Bell Atlantic Network Services, Inc. v. Covad Communications Group*,

262 F.3d 1258, 1268 (Fed. Cir. 2001); or (3) the patentee disavowed an interpretation of a claim

during prosecution.  *See Texas Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1204 (Fed.

Cir. 2002).

"Importantly, the person of ordinary skill in the art is deemed to read the claim term not

only in the context of the particular claim in which the disputed term appears, but in the context

of the entire patent, including the specification."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313

(Fed. Cir. 2005).  However,

> [t]he written description [] is not a substitute for, nor can it be used to re-write, the
> chosen claim language. Specifications teach. Claims claim. Though understanding the
> claim language may be aided by the explanations contained in the written description, it
> is important not to import into a claim limitations that are not a part of the claim. For
> example, a particular embodiment appearing in the written description may not be read
> into a claim when the claim language is broader than the embodiment.

*Superguide Corp. v. DirecTV Enters.*, 358 F.3d 870, 875 (Fed. Cir. 2004)(citations and

quotations omitted).

*Purpose of the Patent*

The patent's Abstract provides:

The present invention relates to an improved method and apparatus for an interactive, computerized catalog system in which a customer can selectively access video and audio catalog data from a computerized catalog memory that permits a customer to peruse an entire catalog of products or services or select specific portions from specific catalogs or services and if desired place an order which is processed electronically and from which customer profile marketing data is selectively generated.

'832 Patent at 1.  The patent's Summary of Invention provides, *inter alia*:

It is an object of the present invention to provide an improved method and apparatus for an interactive, computerized electronic catalog system.  It is another object of the present invention to overcome the difficulties, shortcomings and inefficiencies presented by the prior art electronic catalog systems.  It is yet another objective of the present invention to provide an improved, cost efficient interactive electronic catalog process and system which provides efficient product and service selectivity to prospective customers and which selectively generates market profile data of user/customers.

*Id.*

*Telephone Terminal*

The first disputed term of the patent is "telephone terminal."  Furnace Brook asserts that the term "telephone terminal" should be interpreted to mean "a customer's terminal, whether hard wired or portable."[1]  Overstock asserts that the term "telephone terminal" should be interpreted to mean "a standard customer telephone unit which may be hardwired or portable and has a standard commercial handset, a touchtone pad, a display unit and an audio unit such that it is not a computer system or personal computer."

The term "telephone terminal" first appears in Claim One, which recites, in part:

An improved interactive computerized catalog process comprising the steps of:
        storing digitized graphic catalog data in a selectively addressable computer

_____

[1] As addressed *infra*, Furnace Brook asserts that the term "customer terminal means" should be interpreted in the same way.

4

> system memory,
> generating a menu of catalog products and services comprising catalog data
>      available for selective viewing at any user's telephone associated terminal
>      screen,
> establishing a selective communication link initiated by a user between said
>      user's telephone terminal and said computer system,
> transmitting said menu of catalog products and services to a user's telephone
>      terminal in response to a user's initial request, ...

*'832 Patent at 10: 54-67*.  The specification explains:

> The telephone terminal 13 comprises a standard customer telephone unit which may be
> hard wired or portable and has a standard commercial handset 20 and touchtone pad 21, a
> display unit 24 preferably capable of displaying alphanumeric and graphic data and an
> audio unit 23 such as the speaker phone arranged to free the user from the normal
> telephone handset.

*'832 Patent at 4:7-13*.  It goes on to describe that:

> There are several commercially available screen phones, for example Northern
> Telephone's Vista 300 phone or Bellcore's Mediacom System which both include digital
> data terminal features utilizable in accordance with applicants' improved interactive
> catalog system.

*'832 Patent at 4:14-18*.

The parties dispute whether the patent covers the use of a cellular phone or a computer by

the consumer.  Overstock contends that it does not, and that the use of a cell phone or computer

instead of a "standard commercial handset and touchtone pad" would not infringe on the patent.

*Transcript at 27*.  Furnace Brook responds that the term "telephone" in 1995 would have been

commonly understood to include a cellular telephone.

Furnace Brook argues that Overstock's interpretation excluding cellular phones asks the

Court to limit a claim to the embodiments disclosed in the specification, as is forbidden under

claim construction law.  While it is improper to import into a claim limitations that are not part

5

of the claim, *see Superguide, supra*, it is nevertheless permissible to look to the specification for explanation and understanding, even where the claim language is broader than an embodiment. In this case, there is no dispute that cellular technology was known and developing in the relevant years, and there is no mention of cellular technology in the patent claims or specification.

As just set forth, the specification describes the telephone terminal as being a standard customer telephone unit, which may be hard-wired or portable, along with other features.  It describes a "speaker phone arranged to free the user from the normal telephone handset" as an example of an audio unit.  Fairly read in the context of the invention and claim language, as informed by the specification language, the term "portable" reveals that the hard-wired user telephone may have a detachable handset, which does not by itself broaden the term "telephone terminal" to include a cellular phone.  The Court need not and does not at this stage of the litigation consider whether the use of a cellular phone would invoke the doctrine of equivalence if the phone comported in all meaningful respects with the telephone terminal claimed in the patent.  While Furnace Brook complains that Overstock has not produced evidence to show that cellular telephones were not considered standard telephones in 1995, Furnace Brook has not produced evidence to show that they were.  It is well known that the claims of the patent define the invention to which the patentee is entitled the right to exclude.  In the absence of any reference whatever to cellular telephones or cellular technology, this 1995 patent is not read to claim such.   This patent, as explained by the specification, claims landline telephones, which may or may not have a portable or detachable handset.

6

Furnace Brook contends and Overstock denies that a telephone terminal could also be a computer.  The use of the words "between said user's telephone terminal and said computer system" in Claim One shows that a computer was not contemplated at the user end.  When the Patentee intended to talk about a computer, he did so by using the word computer, as was frequently used when describing the retailer end of the invention, but never used when describing the customer end of the invention.  A computer is beyond the specified embodiments, which do not limit, but explain this patent's claim of a telephone terminal as a standard telephone with display screen or as a touch tone telephone associated with a cable TV.

Although the prosecution history is generally not as useful a guide to a claim's meaning as the specification, it is worth here noting that in the prosecution history, the Examiner proceeded to describe the unique combination of concepts that ultimately allowed the patent to issue, specifically the "combination of all of the systems into a method of creating an interactive catalogue where the user is given the option of including data from his transactions into a customer marketing profile data file." *Id.*

The prosecution history includes the following statement by the patent examiner following the amendments filed on December 27, 1996:

> The use of a telephone and a computer to communicate a catalogue over the phone lines is known in the art.  Similarly, the use of a phone system as a survey tool is also known.  Further, it is known that purchases are often analyzed for data relating to the consumer.

*Notice of Allowability at 2, OSTKFB001618.*

7

The Examiner then proceeded to describe the unique combination of concepts that ultimately allowed the patent to issue:

> However, the prior art does not teach the combination of all of the above systems into a method of creating an interactive catalogue where the user is given the option of including data from his transactions into a customer marketing profile data file.

*Id.*

The notice of allowance makes plain that on one end is a computer and on the other end is a telephone, which, the patent makes clear, may or may not be associated with a cable TV system.  Furnace Brook argues that because the claims do not require two computers does not necessarily mean that two computers could not be used in the invention.  But as just noted, the statements of the patent examiner, when allowing the patent to issue make clear that the unique nature of the invention was the combined interaction of a telephone and computer in communicating a catalog over the phone lines, where the user has the option of whether to include "data from his transactions into a customer marketing profile."  It would defy the notice purpose of patents to find a user-end computer claimed in this patent.

As earlier noted, Furnace Brook argues that the terms telephone terminal, customer terminal means, and user terminal are used interchangeably because they all mean the same thing. The Court disagrees.  As explained *infra*, the Court concludes that the patentee's use of "customer terminal means" evidences that at the customer end may only be a telephone terminal or a telephone-associated cable-TV.  This is supported by the use of the term "plurality of customer terminal means" in Claim 5.

8

The Court concludes that neither a cellular telephone nor a computer on the user end is claimed by the '832 Patent.  Because the terms standard customer telephone unit (hard-wired or portable), standard commercial handset, touchtone pad, a display unit and an audio unit are the named elements that comprise a telephone terminal, the Court concludes that "telephone terminal" means a "standard landline telephone unit, which has a standard commercial handset, a touchtone pad, a display unit and an audio unit, and which may have a cordless handset."

*Customer Terminal Means*

Furnace Brook contends that "customer terminal means" should be construed in the same way as "telephone terminal," which they assert means "a customer's terminal, whether hard wired or portable."  Overstock contends that "customer terminal means" is a "standard customer telephone unit which may be hardwired or portable and has a standard commercial handset, a touchtone pad, a display unit and an audio unit, such that it is not a computer system or personal computer, or alternatively is an interactive hookup with a touchtone telephone and a cable TV system to selectively display the requested catalog data and menu on a particular TV channel."

"Customer Terminal Means" first appears in Claim Five, which recites, in part:

An improved interactive computerized catalog system comprising: central data processing means for storing and selectively addressing digitized graphic catalog data, a plurality of customer terminal means for displaying alphanumeric data during interactive communications between the terminal and central data processor means, switchable communication means activated by individual ones of said plurality of customer terminal means for selectively interconnecting ones of said plurality of customer terminal means with said central data processing means, ...

*'832 Patent at 11: 32-44.*  Claim Seven recites:

> The improved interactive computer catalog system of claim 5 wherein said customer terminal means comprise display means for displaying alphanumeric and graphic data and further including data entry means including a key pad for entering alphanumeric data for transmission to said central data processor means.

*'832 Patent at 12: 4-9.* "Customer terminal means" also appears several other times in Claim Eight.

Overstock contends, and the Court agrees, that the claim does not provide the structure for performing the function "for displaying alphanumeric data," or "for displaying alphanumeric and graphic data," and that this term is therefore a "means-plus-function" element, and that the claim scope is therefore limited to the structures disclosed in the specification, and their equivalents.

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

35 U.S.C. § 112. *See also Intel Corp. v. VIA Techs.*, 319 F.3d 1357, 1367 (Fed. Cir. 2003) (means-plus-function claims are allowed, but their scope is limited to the specific structures disclosed in the specification and their equivalents). "Means-plus-function claiming applies only to purely functional limitations that do not provide the structure that performs the recited function." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1311 (Fed. Cir. 2005)(citation omitted). The specification provides:

> The user terminal may be the type described in conjunction with FIG. 1 or alternatively may be an interactive hookup with a touch tone telephone and a cable TV system to selectively display the requested catalog data and menu etc. on a particular TV channel."

*'832 Patent 7:5-9.*

10

The only structures disclosed for the user terminal, which the Court reads to be the same as the customer terminal means, are the "telephone terminal" in figure 1 and the "interactive hookup with a touch tone telephone and a cable TV system." The patent includes references to dialing toll-free 800 numbers, and connecting via a telephone exchange. Because this term is subject to Paragraph 6 of Section 112 of the Patent Law, the Court accordingly limits the term to corresponding structures disclosed in the specification and their equivalents.

The Court concludes that a "customer terminal means" is "either a standard landline telephone unit, which has a standard commercial handset, a touchtone pad, a display unit and an audio unit, and which may have a cordless handset, or is an interactive hookup with a touchtone telephone and a cable TV system to selectively display the requested catalog data and menu on a particular TV channel."

*Selective Communication Link*

"Selective Communication Link" is recited in Claim One, as cited *supra*. Furnace Brook's proposed construction of "selective communication link" and "switchable communications means" is "a communication link via an online interactive communications network." Overstock's proposed construction of "selective communication link" is "a dial-up connection through a telephone exchange or a private branch exchange (" PBX") to a telephone network such that it is not the Internet." Furnace Brook argues that Overstock's construction imports embodiments into the claims and ignores intrinsic evidence of other embodiments.

11

Selective communication link is recited in Claim One as a component of one step of the improved interactive computerized catalog process.  The specific step is  "establishing a selective communication link initiated by a user between said user's telephone terminal and said computer system."  *'832 Patent at 10: 62-64.*  The specification teaches:

> In response to a customer initiating a request by dialing a predetermined 800 telephone number, the telephone exchange signals the central data processor that a user has requested service and the processor in response thereto retrieves the digital catalog data selected by the user inquiry for transmission via the telephone exchange and communication link to the user's terminal.

*'832 Patent at 3: 20-26.*  It also teaches in relation to the telephone-associated cable-TV, that

> As was described in conjunction with FIG. 1, a user/customer would establish a communication path from a user TV terminal through the communication system[,] for example a PBX telephone exchange network, marketed by AT&T. ... which is functionally and structurally similar to the apparatus described in connection with FIGS. 1 and 4.

*'832 Patent at 6: 64 - 7: 5.*

It is evident that the selective communications link is the telephone line connection established between the user's terminal and the retailer-end computer.  The Court adopts an interpretation similar to Overstock's proposal and concludes that a "selective communication link" is "a dial-up connection through a telephone exchange or a private branch exchange to a telephone network."

*Switchable Communication Means*

As earlier noted, Furnace Brook contends that a "switchable communication means" is the same as a "selective communication link," and is "a communication link via an online interactive communications network."  Overstock contends that "switchable communication

12

means" is also a means plus function claim and should be interpreted to be a "dial-up connection through a telephone exchange or a private branch exchange or PBX to a telephone network such that it is not the internet."

The relevant element of Claim 5 provides that the improved computerized catalog system is comprised, *inter alia*, of:

> switchable communications means activated by individual ones of said plurality of customer terminal means for selectively interconnecting ones of said plurality of customer terminal means with said central data processing means.

*'832 Patent at 11: 40-44.*

Overstock contends that this term is also a "means plus function" element because the claim does not provide the structure for performing the function of "selectively interconnecting" and that the claim scope is accordingly limited to the disclosed structure and its equivalents. The Court agrees that the term switchable communication means is subject to Paragraph 6 of Section 112 of the Patent Law, and accordingly limits the term to corresponding structures disclosed in the specification and their equivalents.

The function of a switchable communications means is to interconnect a customer user terminal to the central data processing means. The structures disclosed for interconnecting a customer terminal means to a central data processor are an 800 telephone number, a dial-up connection through a telephone exchange or a private branch exchange. The internet was known in 1995, but is not mentioned in the '832 patent. Nor is it mentioned in the prior art cited in the

'832 patent.  The Court does not find the patent's use of the term "online" to indicate that the internet or the world wide web is a selective communication link or switchable communications means claimed in the patent.  Rather, the use of "online" indicates being "live" or connected via a telephone line.  For example, the patent specification describes that "an order processor may be located at Regal's warehouse in Ontario or may be coupled online via a normal telephone network to a site of the central data processor."  *'832 Patent at 3: 51-54.*  Accordingly, a "switchable communication means" is a "dial-up connection through either a telephone exchange or a private branch exchange to a telephone network."

*Data Regarding an Order Transaction*

Furnace Brook's proposed construction for this term is "information relating to a customer's order." Overstock's proposed construction for this term is "customer name, address and order placed."

Furnace Brook argues, and the Court agrees, the language of the specification indicates that a customer may first authorize the addition of his name and address to a customer data file, and secondly, may authorize an update of the customer profile data to include any order then placed.   Specifically, the specification provides:

> Preferably as part of the initial menu displayed at the customer's telephone terminal, a request for the customer's approval to include the customer's name and address in a customer data file is made.  If the customer signals his approval, e.g., by depressing an appropriate key at the customer terminal, the customer's name and address will be automatically added to the customer data file.  In addition, if authorized by the customer, the customer's profile data would be updated to include any order placed at that time.

*'832 Patent at 8:10-19.*

14

The specification teaches that a customer who has agreed to have his name and address recorded by the retailer, may additionally agree to have a profile updated to record the order placed. Accordingly, "data regarding an order transaction" is "the order placed by the customer."

*Selectively Elect to be Included In or to be Excluded From*

Furnace Brook asserts that this term should be interpreted to mean "selectively elect, by, for example, depressing the appropriate key on the customer terminal, to be included in, or to be excluded from." Overstock asserts that this term should be interpreted to mean "when placing an order, a customer using a telephone terminal may elect to have his/her name added or deleted by activating a computer code at the customer telephone terminal." Claim One recites, in part:

> ...enabling a user when placing an order to selectively elect to be included in or to be excluded from said customer profile marketing data file created as part of a completed catalog product or services order transaction.

*'832 Patent at 11: 12-15.*

A customer elects to have his or her name deleted from a computer file after placing an order "by electronically activating a marketing data delete file" and that customer gives his or her approval to having data included in a customer data file by "depressing an appropriate key at the customer terminal." Accordingly, "selectively elect to be included in or to be excluded from" is a "customer's acceptance or denial of an invitation to have his name and address, and, if applicable, his order placed, retained in a customer profile by the retailer."

15

The interpretations of the asserted claims of United States Patent No. 5,721,832 are as set forth above.

X

X

X

X

X

SO ORDERED.

Dated:  White Plains, New York
        September 27, 2006.

_____

Charles L. Brieant, U.S.D.J.

16

SO ORDERED.

Dated:  White Plains, New York
       September 27, 2006.

_Charles Brieant_
Charles L. Brieant, U.S.D.J.